No. 25-128

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

---

**NICHOLAS C. SMITH-WASHINGTON**, et al.,
Plaintiffs-Appellees,

v.

**JAMES KIRKHAM**, **MATTHEW SESSOMS**,
Objectors-Appellants,

v.

**TAXACT, INC.**,
Defendant-Appellee.

---

On Appeal from the United States District Court for the
Northern District of California
Docket No. 23-00830

---

## REPLY BRIEF ON BEHALF OF OBJECTORS-APPELLANTS
## KIRKHAM AND SESSOMS

---

COHEN, PLACITELLA & ROTH, P.C.
James P. Goslee
Eric S. Pasternack
2001 Market St., Suite 2900
Philadelphia, PA 19103
(215) 567-3500
jgoslee@cprlaw.com
epasternack@cprlaw.com

*Attorneys for Objectors-Appellants*

## TABLE OF CONTENTS

INTRODUCTION ................................................................................ 1

ARGUMENT ..................................................................................... 5

A.  The District Court did not comprehensively explore all factors
and give a reasoned response to Objectors' detailed objections
in the Final Approval Order .......................................................... 5

  1.  The Missouri Consent Judgment is not a substitute for
  injunctive relief. ...................................................................... 5

  2.  The District Court failed to apply the applicable legal
  standard in approving the use of a claims-made process. ..... 9

    a.  The District Court had to evaluate whether the
    Settlement's claims-made process is unduly
    demanding. ......................................................................... 9

    b.  The District Court did not evaluate whether the
    Settlement's claims-made process is unduly
    demanding. ...................................................................... 10

  3.  The District Court failed to recognize that the Settlement is
  reversionary. ........................................................................ 17

  4.  The District Court did not appreciate the difference
  between mandatory and discretionary statutory
  damages. ............................................................................... 27

  5.  The District Court overlooked that all Class Members can
  assert claims under the IRS Code. ...................................... 29

B.  The record does support the District Court's conclusory
statements in the Final Approval Order. .................................. 32

ii

CONCLUSION ........................................................... 36

STATEMENT OF RELATED CASES ..................................... 37

FORM 8. CERTIFICATE OF COMPLIANCE FOR BRIEFS ............... 38

CERTIFICATE OF SERVICE ............................................ 39

# TABLE OF AUTHORITIES

## Cases

*Allen v. Bedolla,*
    787 F.3d 1218 (9th Cir. 2015) ........................................................ 13, 36

*Blue Chip Stamps v. Manor Drug Stores,*
    421 U.S. 723 (1975) ................................................................................. 8

*Briseño v. Henderson,*
    998 F.3d 1014 (9th Cir. 2021) .................................................... passim

*Buckeye Coal & R. Co. v. Hocking Valley R. Co.,*
    269 U.S. 42 (1925) .................................................................................. 9

*Espinosa v. Ahearn,*
    26 F.3d 539 (9th Cir. 2019) ................................................................ 17

*Gottlieb v. Wiles,*
    11 F.3d 1004 (10th Cir. 1993) ........................................................... 15

*In re Bluetooth Headset Products Liability Litigation,*
    654 F3d 935 (9th Cir. 2011). ............................................ 21, 24, 25, 28

*In re Cal. Pizza Kitchen Data Breach Litig.,*
    129 F.4th 667 (9th Cir. 2025)...................................................... passim

*In re Corrugated Container Antitrust Litig.,*
    643 F.2d 195 (5th Cir. 1981) .............................................................. 15

*In re Pac. Enters. Secs. Litig.,*
    47 F.3d 373 (9th Cir. 1995) ................................................................ 35

*In re Volkswagen "Clean Diesal" Mktg., Sales Prac. & Prod. Liab.
Litig.,*
    895 F.3d 597 (9th Cir. 2018) ....................................................... 11, 26

iv

*JL Beverage Co., LLC v. Jim Bean Brands Co.,*
    828 F.3d 1098 (9th Cir. 2016) ............................................ 20

*Kinney-Coastal Oil Co. v. Kieffer,*
    277 U.S. 488 (1928) ............................................ 7

*Kleiser v. Chavez,*
    55 F.4th 782 (9th Cir. 2022) ............................................ 17

*Laguna v. Coverall N. Am. Inc.,*
    753 F.3d 918 (9th Cir. 2014) ............................................ 13, 14

*McKinney-Drobnis v. Oreshack,*
    16 F.4th 594 (9th Cir. 2021) ............................................ 6, 15

*Pearson v. NBTY, Inc.,*
    772 F.3d 778 (7th Cir. 2014) ............................................ 14

*Reynolds v. Beneficial Nat'l Bank,*
    288 F.3d 277 (7th   Cir. 2002) ............................................ 29

*Roes v. SFBSC Mgmt., LLC,*
    944 F.3d 1035 (9th Cir. 2019) ............................................ passim

*Saucillo v. Peck,*
    25 F.4th 1118 (9th Cir. 2022) ............................................ 11, 20

*State ex rel. Reg'l Conv. & Sports Complex Auth. v. Burton,*
    533 S.W.3d 223 (Mo. 2017) ............................................ 5

*Staton v. Boeing Co.,*
    327 F.3d 938 (9th Cir. 2003) ............................................ 28

*Stokwitz v. United States,*
    831 F.2d 893 (9th Cir. 1987) ............................................ 34

*Thompson v. Enomoto,*
  915 F.2d 1383 (9th Cir. 1990) ................................................... 5

*Trump v. CASA, Inc.* ("*CASA*"),
  __ U.S. __, 2025 WL 1773631 (2025) ................................... 7, 8

*Trump v. Hawaii,*
  585 U.S. 667 (2018) .............................................................. 8

## Statutes

11 U.S.C. § 25020(c)(2) ........................................................ 31

18 Pa. C.S. § 5701 ................................................................ 31

26 U.S.C. § 6103(a) ......................................................... 33, 35

26 U.S.C. § 7431 ............................................................. 3, 31

26 U.S.C. § 7431(c) .............................................................. 32

## Rules

Fed. R. Civ. P. 23(e) ....................................... 2, 9, 11, 35

Fed. R. Civ. P. 23(e)(2)(C) ............................................ 10, 11

## Treatises

4 Newberg and Rubenstein on Class Actions § 13:60 (6th ed. 2024) ..... 26

Federal Judicial Ctr., Judges' Class Action Notice and Claims Process
  Checklist and Plain Language Guide ................................... 13

## Regulations

26 C.F.R. § 301.6103(d)(1) ................................................................ 31, 32

## INTRODUCTION

The District Court had to do more than just acknowledge that Appellants made certain objections to the Settlement. It had to respond to each. It also had to subject the Settlement to heightened scrutiny and independently analyze whether the Settlement is fair, reasonable, and adequate. The District Court satisfied none of these procedural requirements though. It addressed only two of Rule 23(e)'s factors during the preliminary and final approval hearings. It gave counsel representing Objectors only "three minutes to kind of summarize their objections" at the final approval hearing. 5-ER-1013. And in its decision (1-ER-1-12), the District Court responded to none of Appellants' objections substantively.

I.      To this day, Appellees have never explained—and the District Court has failed to examine—why the Settlement requires the Class Members to continue using TaxAct's service to obtain the Settlement's in-kind benefits yet includes no injunctive relief. The District Court simply accepted Appellees' argument that the Stipulated Consent Judgment ("Consent Judgment") between TaxAct Act, Inc. ("TaxAct") and the Missouri Attorney General eliminates the need for

1

injunctive relief here. That need however remains. Because equitable remedies are party-specific, the Class Members cannot rely on the Consent Judgment for protection as it explicitly denies them third-party beneficiary status and bars them from enforcing the Consent Judgment against TaxAct. In thus accepting Appellees' excuse for the Settlement's lack of injunctive relief without addressing the Consent Judgment's express limitations, the District Court failed to ensure that the Settlement's proponents have appropriately justified their decision to include no injunctive relief in the Settlement while requiring the Class Members to again trust TaxAct with their confidential tax return information to obtain the Settlement's in-kind benefits.

II.     While there are many cases in which claims-made processes are unavoidable, this is not one. More than most, TaxAct has records from which the Class Members could be identified and were. Under Rule 23(e), the District Court had to evaluate whether the Settlement's claims-made process was unduly demanding, taking into TaxAct's comprehensive records. The District Court did not however scrutinize Appellees' justification for the claims-made process. It did not even ask counsel a single question about the low participation rate. It just

2

adopted the *Smith-Washington* Plaintiffs' ("Plaintiffs") reasoning as stated in the papers submitted along with their motion for preliminary approval. 1-ER-5. This Court cannot therefore infer that the District Court scrutinized the Settlement in the depth required considering how Plaintiffs made no attempt to square their belief that a claims-made process is necessary with the evidence that the Settlement could be administered without requiring the Class Members to submit claims. The District Court also failed to appreciate that the Settlement's in-kind payments are reversionary and another subtle sign that Class Counsel have placed their interests over those of the Class. *See* Appellants' Br. at 38-44.

III.    Appellees argue that the District Court appropriately evaluated the reasonableness and allocation of the Settlement's benefits yet also acknowledge that the District Court failed to address the availability of mandatory statutory damages and Objectors' argument that all Class Members can assert claims under 26 U.S.C. § 7431 ("IRS Code"). Perhaps recognizing that this Court's precedents require the District Court to provide a reasoned explanation of its decision, Appellees respond that the District Court questioned Plaintiffs about

whether some causes of action provide for mandatory damages and the parties submitted extensive briefing on these issues. That only goes to show how important these issues are and how pivotal their absence is from the District Court's analysis. Because of the District Court's silence on this issue, this Court cannot infer that the District Court meaningfully accounted for these claims and their potential value in evaluating the Settlement and granting final approval.

Because class action settlements impose binding judgments on absent class members, federal courts must ensure that they are fair, reasonable, and adequate. The District Court did not here. This Court should therefore reverse the Final Approval Order.

## ARGUMENT

**A. The District Court did not comprehensively explore all factors and give a reasoned response to Objectors' detailed objections in the Final Approval Order.**

### 1. The Missouri Consent Judgment is not a substitute for injunctive relief.

The District Court dismissed Objectors' concerns about the Settlement's lack of injunctive relief without addressing the Consent Judgment between TaxAct and the Missouri Attorney General in its entirety.[1]

The District Court found that "TaxAct is subject to a consent judgment with the Missouri Attorney General barring it from continuing the practices that form the basis of the class's allegations." 1-ER-5-6. The District Court then concluded that the Consent Judgment "would seem to ensure that TaxAct will not continue . . . the challenged behaviors and continue to harm the class." *Id.* The District Court never explained on the record why the Class Members should—or

---

[1] In construing a consent decree, courts use ordinary contract principles and the law of the situs state. *See Thompson v. Enomoto*, 915 F.2d 1383, 1388 (9th Cir. 1990). Under Missouri law, the "terms of a contract are read as whole to determine the intention of the parties and are given their plain, ordinary, and usual meaning." *State ex rel. Reg'l Conv. & Sports Complex Auth. v. Burton*, 533 S.W.3d 223, 226 (Mo. 2017).

5

even could—depend on the Attorney General of one state—and a foreign one for many—to protect the confidentiality of their tax return information which they must hand over to TaxAct to obtain the full measure of the Settlement's benefits. *See Roes v. SFBSC Mgmt., LLC*, 944 F.3d 1035, 1052 (9th Cir. 2019). The District Court thus abused its discretion in the first instance by failing to develop the record adequately and respond to Objectors' concerns on this score. *See id.; McKinney-Drobnis v. Oreshack*, 16 F.4th 594, 607 (9th Cir. 2021).

While Appellees claim that the District Court "reasonably assessed" the Consent Judgment and "specifically addressed Objectors-Appellants' arguments," they offer no response to Objectors' argument that the District Court abused its discretion by failing to read the parts of the Consent Judgment its cites in its written decisions—those are Paragraphs 2 to 7—together with Paragraph 19. TaxAct Br. at 61-62; Plaintiffs' Br. at 61.

Paragraph 19 provides that no "person or entity" that is "not a signatory hereto is a third-party beneficiary of this Consent Judgment" and that "[n]othing in [it] shall provide any rights to or permit any person or entity not a party hereto, to enforce any provisions of this

6

Consent Judgment." 4-ER-613. Because the Class Members are not third-party beneficiaries of the Consent Judgment and Paragraph 19 allows only the Attorney General of the State of Missouri to enforce its terms, the Consent Judgment is not a substitute for granting the Class Members injunctive relief.

The District Court also erred as a matter of law in finding the Missouri Consent Judgment sufficient to protect the Class Members' interests. In discussing how equitable remedies operate on a "party-specific" basis, the Supreme Court has observed that the "equitable tradition has long embraced the rule that courts generally 'may administer complete relief between the parties.'" *Trump v. CASA, Inc.* ("*CASA*"), __ U.S. __, 2025 WL 1773631, *25 (2025) (quoting *Kinney-Coastal Oil Co. v. Kieffer*, 277 U.S. 488, 507 (1928)). While the Court recognized that "party-specific injunctions sometimes 'advantage nonparties,'" it explained that "they do so only incidentally." *Id.* at *23-25 (quoting *Trump v. Hawaii*, 585 U.S. 667, 717 (2018) (Thomas, J., concurring)). And so, the Court concluded that even if a court's exercise of its equitable powers may have the "practical effect of benefiting nonparties," an "injunction's protection extends only to the suing

7

plaintiff" because "only the plaintiff can enforce the judgment against the defendant responsible for the nuisance." *Id.*

Although the Class Members may incidentally benefit from the Consent Judgment, that does not mean they have received relief from it. Because they are neither party to nor third-party beneficiaries of the Consent Judgment, the Class Members cannot seek to enforce its terms. *See CASA*, __ U.S. at __, 2025 WL 1773631, *24-25 n.11; *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 750 (1975) ("a consent decree is not enforceable directly or in collateral proceedings by those who are not parties to it even though they were intended to benefit by it"); *Buckeye Coal & R. Co. v. Hocking Valley R. Co.*, 269 U.S. 42, 48-49 (1925) (holding nonparty injured by defendant's noncompliance could not enforce the injunction). Under the Court's party-specific understanding of equitable remedies, the Consent Judgment's protections thus extend only to Missouri Attorney General and perhaps the citizens of the State of Missouri. So, for that reason, too, the District Court abused its discretion in justifying the Settlement's lack of injunctive relief on a consent judgment no Class Member may enforce.

8

## 2. The District Court failed to apply the applicable legal standard in approving the use of a claims-made process.

The District Court abused its discretion by misstating and failing to apply the applicable legal standard in approving the Settlement's use of an unduly demanding claims-made process.

### a. The District Court had to evaluate whether the Settlement's claims-made process is unduly demanding.

Plaintiffs argue that the question here "is whether the district court applied the appropriate standard in finding the settlement to be 'fair, reasonable, and adequate' and not whether it 'acknowledged' the wording of Rule 23(e) and any Advisory Committee notes." Plaintiffs Br. at 32. That misstates the issue here. Before 2018, Rule 23(e) only required settlements to be "fair, reasonable, and adequate." *Briseño v. Henderson*, 998 F.3d 1014, 1023 (9th Cir. 2021). But today, Rule 23(e) sets forth "specific factors" that courts must consider "in determining whether a settlement is 'fair, reasonable, and adequate." *Id.*

As amended, Rule 23(e) requires courts to assess "the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims." *See Briseño*, 998 F.3d at

9

1023-24. This factor requires courts to scrutinize the method of claims processing to ensure that it facilitates the filing of legitimate claims without being "unduly demanding." Advisory Committee Notes to 2018 Amendment to Fed. R. Civ. P. 23(e)(2)(C). The District Court did not refer to this factor in its decision and thus misstated the applicable legal standard. 1-ER-5. The Final Approval Order should therefore be reversed as this Court does not generally employ a "'harmless error standard for class action settlement review.'" the Final Approval Order should be reversed. *See Saucillo v. Peck*, 25 F.4th 1118, 1131 (9th Cir. 2022) (quoting *In re Volkswagen "Clean Diesal" Mktg., Sales Prac. & Prod. Liab. Litig.*, 895 F.3d 597, 613 (9th Cir. 2018)).

### b. The District Court did not evaluate whether the Settlement's claims-made process is unduly demanding.

The District Court's silence on whether the Settlement's claims-made process is unduly demanding also leaves this Court without basis to find that the District Court applied the correct legal standard. To fill that void, Appellees point to the District Court's finding that "the choice to use a claims-made model was reasonable" because it "increased the likelihood that a substantial amount of the settlement money will be

received and redeemed by the class members." Plaintiffs Br. at 28-29; TaxAct Br. at 32-33. This misunderstands the "balance" courts must strike in considering Rule 23(e)'s factors. *See Briseño*, 998 F.3d at 1024.

As amended, Rule 23(e) requires courts to balance the need to "deter or defeat unjustified claims" with ensuring that the claims process is not "unduly demanding." Fed. R. Civ. P. 23(e)(2)(C) (Advisory Committee Notes). There is a natural tension between these aims. Should one prioritize the former over or to the exclusion of the latter, one could justify any burden that could be conceived of that may be thought to deter unjustified claims. And while that is no doubt a vital concern, not all claims processes can be justified. At some point, there will be diminishing returns and the burden imposed on class members to qualify will serve only the illegitimate end of diminishing the claims participation rate. *See Roes*, 944 F.3d at 1058-59.

This Court has no basis to infer that the District Court satisfied its obligation to balance these competing aims. *See In re Cal. Pizza Kitchen Data Breach Litig.*, 129 F.4th 667, 675 (9th Cir. 2025). The District Court, after all, neither addressed the "unduly demanding" factor in its decision, nor at the preliminary or final approval hearings.

Even after counsel to the Plaintiffs stated that there had been only a "5 percent claims rate," the District Court asked not one question about the low participation rate. 5-ER-1005-06. That Plaintiffs anticipated such a low claims rate should have raised "an urgent red flag" for the District Court that "more attention and scrutiny" was necessary. *See Briseño*, 998 F.3d at 1026. And with the actual claims rate falling below even that, "heightened scrutiny was all the more imperative here." *Roes*, 944 F.3d at 1054-55, 1060; *see also Allen v. Bedolla*, 787 F.3d 1218, 1224 n.4 (9th Cir. 2015). But contrary to this Court's precedents, the District Court did not scrutinize Appellees' justification for using a claims-made process. *See Roes*, 944 F.3d at 1060; *see also Briseño*, 998 F.3d at 1026 (observing that low claims rate was no surprise "given how the parties knowingly structured the settlement"); *Laguna v. Coverall N. Am. Inc.*, 753 F.3d 918, 934 (9th Cir. 2014) (Chen, J., dissenting) ("This then begs the question why the parties chose to require a claims process in the first place.").

Proving Appellants' point, Plaintiffs admit that ***"[o]f course, it would have been possible to simply mail checks out to people on a class list."*** Plaintiffs Br. at 29 (emphasis added). While they also

12

argue that the District Court "was well within its discretion" to find that the claims-made process "was not unduly burdensome," *id.*, the two positions cannot be squared. If checks could have been simply mailed to some—if not all—class members, "those claims should [been] paid directly without requiring claim forms." *Laguna*, 753 F.3d at 934 (Chen, J., dissenting) (quoting Federal Judicial Ctr., *Judges' Class Action Notice and Claims Process Checklist and Plain Language Guide*, pg. 6); *see also Pearson v. NBTY, Inc.*, 772 F.3d 778, 784 (7th Cir. 2014).

While the District Court acknowledged Objectors had argued that the claims-made process could not be justified here because "TaxAct's records could be used to send settlement funds to each affected member of the class," 1-ER-5, it is not enough to simply acknowledge that Objectors made the argument. As this Court has recognized, a "district court must do more than acknowledge that warning-sign provisions exist and then conclude that they are not dispositive without further apparent scrutiny." *McKinney-Drobnis*, 16 F.4th at 611. It must "independently analyze the evidence before it in making its determination"; it cannot "rely solely upon the assertions of the proponents of the settlement as to what the evidence shows." *See*

13

*Gottlieb v. Wiles*, 11 F.3d 1004, 1015 (10th Cir. 1993); *see also In re Corrugated Container Antitrust Litig.*, 643 F.2d 195, 211 (5th Cir. 1981). A district court must also "explain" its reasoning. *Roes*, 944 F.3d at 1059-60.

Yet the District Court simply adopted Plaintiffs' rationale for employing a claims-made structure. 1-ER-5 (citing Dkt. No. 121, Plaintiffs' Motion for Preliminary Approval, at 43). It should not have. For one thing, Plaintiffs offered no evidence to the District Court to substantiate their claims about the need for a claims-made process. 2-ER-62-64; 4-ER-602-03. Instead, they offered only the say-so of Class Counsel. 4-ER-656. For another, in moving for preliminary approval, Plaintiffs made no attempt to reconcile the supposed need for a claims-made process with the evidence that TaxAct has multiple data points for each Class Member, including their names, home addresses, email address, phone numbers, Social Security Numbers, Driver's License Numbers. 2-ER-62-64; 4-ER-602-03. And having merely incorporated the argument Plaintiffs made in moving for preliminary approval, the District Court's decision cannot be read as a response to Appellants' objection.

14

Even now, Appellees offer no *evidence* to justify their decision to use a claims-made process, which they anticipated would have a 5% claims rate, and ultimately resulted in a 3.96% claims rate. Sure enough, TaxAct contends that the "only physical contact information TaxAct has is the home address that [the class members] listed when they used TaxAct's services upon filing their returns many years before the settlement was administered." TaxAct Br. at 32. TaxAct did not however make this argument below and thus waived it. *See Kleiser v. Chavez*, 55 F.4th 782, 784 (9th Cir. 2022). TaxAct also offers only conjecture; it cites no evidence in the record to support this proposition. And even if there were some number of individuals for whom TaxAct lacked current "physical" contact information, TaxAct ostensibly has the "physical" contact information for others, as well as their names, email addresses, phone numbers, Driver's License Numbers, and Social Security Numbers. 2-ER-62-64; 4-ER-602-03. To accept TaxAct's argument would thus "let the perfect become the enemy of the good," which this Court has warned against when "it comes to protecting the interests of absent class members[.]" *See Briseño v. ConAgra Foods, Inc.*, 844 F.3d 1121, 1130 (9th Cir. 2017).

This case is therefore distinguishable from *Espinosa v. Ahearn*, 26 F.3d 539 (9th Cir. 2019). The defendant automakers there could not automatically distribute the settlement to the class because they lacked "complete records of resales of the class vehicles" and thus could not identify "subsequent purchasers who were . . . part of the class." *Id.* at 586. No similar third-party transactions occurred here. Because TaxAct's software was used to prepare at least one tax return for every single Class Member, TaxAct has records, which the claims administrator successfully used to *identify* and *reach* 10,504,519 of the 10,652,166 Class Members. 2-ER-204.

Appellees have moreover offered no justification for denying any of the Settlement's benefits—monetary or in-kind—to the Class Members that used TaxAct's services during the 2024 Tax Year. 4-ER-656. TaxAct could have, after all, informed each Class Member who accessed its website during the filing season for the 2024 Tax Year that they are class members and qualify for relief under the Settlement. TaxAct could have also used that opportunity to confirm their class membership and offer the Class Members a chance to specify how they would like to receive payment. Thus, even if not all Class Members returned and

16

used TaxAct's website during the 2024 Tax Year season, Appellees have offered no justification for denying those that did the benefits of the Settlement, let alone one that could withstand the heightened scrutiny required by this Court's precedents.

***

The District Court thus misstated and failed to apply the applicable legal standard in approving the Settlement's use of an unduly demanding claims-made process.

### 3. The District Court failed to recognize that the Settlement is reversionary.

The District Court concluded that the "settlement does not have the warning signs of collusion" based on an unreasonable finding of fact that the Settlement is not reversionary. 1-ER-4. It is. As Appellees admit, the Settlement's in-kind payments are offered on a claims-made basis and the Class Members must submit a valid claim form and use TaxAct's services to prepare their taxes during the 2024 Tax Year (which has since ended) and then specifically avail themselves of the Xpert Assist service. Plaintiffs Br. at 40. The in-kind payments are therefore reversionary even if no "money leaves the defendant's hands."

17

*See Briseño*, 129 F.4th at 676-77. And that, in turn, renders the Settlement reversionary. *See Roes*, 944 F.3d at 1059.

Hoping to avoid this issue, Appellees claim that Appellants waived this argument. But as this Court has recognized, "when 'the district court considered [an] issue' in its final order approving a class action settlement, the issue is 'not waived on appeal' even if no objector to the settlement raised that issue to the district court." *Saucillo*, 25 F.4th at 1130 (quoting *JL Beverage Co., LLC v. Jim Bean Brands Co.*, 828 F.3d 1098, 1108 (9th Cir. 2016)). An objector therefore "need not be an oracle and predict issues that will arise for the first time in the district court's final order." *Id.* At no point during the preliminary approval hearing did the District Court suggest that it might find that no warning signs exist here because the Settlement is not reversionary. 5-ER-1026-39. Appellants "could not" have waived this argument, as a result. *See Saucillo*, 25 F.4th at 1130.

To rehabilitate the District Court's decision, Appellees dispute the notion that the Settlement's in-kind payment are reversionary. Their conception of reversionary funds is too limited and inconsistent with the functional approach taken by this Court. When this Court first

18

addressed the concept of reverters in *In re Bluetooth Headset Products Liability Litigation*, it did so in the context of a settlement that contained a provision that addressed what happens to unawarded attorney's fees. 654 F.3d 935, 947 (9th Cir. 2011). Since then, this Court has extended the concept and confirmd that Appellees' view finds no support in the law.

While this Court began its discussion in *Roes* with an acknowledgment that reversionary clauses have not been "disallowed ... outright," it emphasized that they are generally disfavored because "they create perverse incentives." 944 F.3d at 1058. Speaking to what those may be, this Court explained that "allowing unclaimed funds to revert to defendants even where class members who do not respond or submit a claim are bound by the class release creates an incentive for defendants to ensure as low a claims rate as possible so as to maximize the funds that will revert." *Id.* After defining a "reversion clause" as one that "directs unclaimed portions of a settlement fund . . . to be paid back to the defendant[,]" this Court identified three: the "Second Tier Cash Pool," the "Dance Fee Payment Pool" and the "Residual Dance Fee Payment Pool." *Id.* at 1058 n.20.

19

The settlement required the defendants to fund the "Second Tier Cash Pool" with $1 million if the total of all claims submitted together with fees exceeded $2 million. *Id.* This Court classified the "Second Tier Cash Pool" as reversionary because "the promised Second Tier Cash Pool money would revert back to the defendants if the claims rate was sufficiently low, even though the non-FSLA claims of all class members who did not make a claim or opt out would nonetheless be extinguished." *Id.* In other words, this Court found the "Second Tier Cash Pool" reversionary even though the settlement only conditionally required the defendants to fund it if the "First Tier Cash Pool" were exhausted. *Id.* at 1040.

The settlement in *Roes* also established a "Dance Fee Payment Pool" and a "Residual Dance Fee Payment Pool" (the "Dance Fee Payment Pools"), which provided for "dance fee payment vouchers [that] had an expiration date, were not transferable, and required class members to do business with defendants again in order to redeem the dance fee payments." *Id.* at 1053. The class members could "claim as much as $8,000 in 'dance fee payments' in lieu of a cash settlement share." *Id.* Said another way, the class members could "retain 100% of

20

the dance fees earned, capped at [the] total dance fee payment allocation for that nightclub." *Id.* The settlement thus did not require the defendants to fund the Dance Fee Payment Pool as that provision of the settlement allowed the class members to retain fees they earned from the defendants' patrons. *Id.* And yet, this Court found that the Dance Fee Payment Pools" were reversionary because any vouchers "not redeemed within the two-year Dance Fee Redemption Period would . . . revert to the defendants." *Id.* at 1058 n.20.

After the entry of the Final Approval Order, this Court issued its *California Piza Kitchen* decision, which involved an uncapped, claims-made settlement. 129 F.4th at 672. Like this case, *California Pizza Kitchen* concerned the "disclosure of sensitive personal information." *Id.* at 677. But in contrast to the Settlement here, the settlement there offered "real benefits to the class members," including (1) up to $1,000 in reimbursement for expenses incurred because of the data breach; (2) up to $5,000 in compensation for monetary losses incurred from actual identity theft; (3) free credit monitoring services and $1 million in identity theft insurance; and (4) an "$100 statutory damages award" for the California subclass. *Id.* at 672.

21

The defendant in *California Pizza Kitchen* argued that "claims-made settlements do not contain reverter provisions, and so *Bluetooth* cannot apply." *Id.* at 676. Expounding on this position, the defendant argued that because the claims-made settlement only required it to "pay out the amount claimed, … no money reverts to" it, and "so there technically can be no reverter provision and thus no *Bluetooth* scrutiny." *Id.* In rejecting that argument, this Court explained that the "fear of collusion applies equally to both claims-made settlements and common-fund settlements." *Id.* "In either case, the purpose of *Bluetooth*'s heightened scrutiny is to probe settlements for signals that class counsel may have colluded with the defendant by selling out the class's interests in exchange for higher fees." *Id.* at 676-77.

Against this backdrop, Appellees' argument that the concerns associated with reversionary clauses are not present here because this case involves a claims-made settlement fails. This Court indeed took up and dismissed this very argument in *California Pizza Kitchen*. Appellees' attempt to distinguish the Settlement's in-kind payments from the reverter of attorney's fees in *Bluetooth* also fails. Although the Settlement here does not involve the reverter of attorney's fees in the

sense contemplated in *Bluetooth,* neither did the settlements in *Roes* or *California Pizza Kitchen.* Yet this Court regarded those settlements as reversionary.

To draw attention away from the District Court's incorrect classification of the Settlement as non-reversionary, Appellees contend that what matters is that the District Court stated that it applied heightened scrutiny to the Settlement. Plaintiffs' Br. at 41. It is not enough to merely incant certain words though. *See Roes*, 944 F.3d at 1049 n.13 ("The court's conclusory statement, without any further analysis, . . . is insufficient.").

The District Court had to independently perform the analysis to satisfy its obligation to subject the Settlement to the required heightened scrutiny. This required the District Cout first to recognize that the Settlement is reversionary. *See Roes*, 944 F.3d at 1059 (holding court failed to subject the settlement to the required scrutiny because it justified "the reversionary aspects of the Second Tier Cash Pool simply by stating that 'the Tier One funds are not reversionary'"). The District Court then had "to scrutinize the[] reversionary clause[] closely and seek adequate justification for [its] inclusion; it was required to 'explain

23

why the reversionary component of a settlement negotiated before certification is consistent with proper dealing by class counsel and defendants." *Id.* (quoting *In re Volkswagen*, 895 F.3d at 612). Put another way, the District Court had to investigate whether the reverter is "justified by unique benefits to the class and supported by provisions that ameliorate concerns about perverse incentives, in order to dispel any concerns that the clauses are the result of implicit collusion or self-serving dealings." *Id.* at 1060.

The District Court satisfied none of these procedural obligations. The District Court first wrongly characterized the Settlement as non-reversionary. 1-ER-4. And then, compounding that error, the District Court adopted Appellees' rationale for employing a claims-made structure here without responding to Appellants' objections. 1-ER-5 (citing Dkt. No. 121, Plaintiffs' Motion for Preliminary Approval, at 43).

Because of the reversionary nature of the Settlement's in-kind payments, Appellants' objections should have prompted the District Court to take a harder look at the Settlement. The District Court should have questioned whether Appellees' various justifications for the claims-made structure carry over and justify withholding the

Settlement's in-kind payments from those Class Members who used TaxAct's services during the 2024 Tax Year but had failed to submit a claim form before the deadline Appellees agreed on. The District Court should have also probed whether the reversionary clause is "justified by unique benefits to the class and supported by provisions that ameliorate concerns about perverse incentives." *Roes*, 944 F.3d at 1060. Had it done so, it would have found the Settlement lacking. The District Court after all repeatedly questioned whether the Settlement provides a "real benefit" to the Class, 5-ER-999-1000, which distinguishes the settlement here from the one in *California Pizza Kitchen*, which provided "real benefits" to the class there. 129 F.4th at 677.

Appellees also argue that it does not matter whether the Settlement is reversionary because Plaintiffs' counsel did not receive a disproportionate amount of attorney's fees and the Settlement Agreement lacks a clear sailing provision. By their logic, the parties to a class action settlement agreement have free rein to structure a settlement in any manner they wish—even if it is counter to the interests of the Class—so long as they do not make the mistake of including any of the traditionally understood subtle signs of collusion in

25

the settlement agreement. *Cf. In re Bluetooth*, 654 F.3d 947. There is little to recommend for limiting the scrutiny of class action settlements, as Appellees suggest.

Even without disproportionate fees or clear sailing and reversionary provisions, "[t]he incentives for the negotiators to pursue their own self-interest and that of certain class members are implicit in the circumstances and can influence the result of the negotiations without any explicit expression or secret cabals." *Roes*, 944 F.3d at 1049 n.13 (quoting *Staton v. Boeing Co.*, 327 F.3d 938, 960 (9th Cir. 2003)). That concern is particularly acute pre-class certification, *Briseño*, 998 F.3d at 1024-25, and where there are parallel cases. *See Reynolds v. Beneficial Nat'l Bank*, 288 F.3d 277, 283 (7th Cir. 2002). This is because "generally, speaking, only one set of plaintiffs' attorneys—those that settle—will get any fees, and attorneys pursuing all the parallel cases will get nothing." 4 Newberg and Rubenstein on Class Actions § 13:60 (6th ed. 2024). The "incentives for the negotiators to pursue their own self-interest" may therefore arise for different reasons but it is no less serious in cases such as this where there are competing class actions and the defendant has chosen to negotiate with counsel other than

26

those appointed by a court to represent the interests of the class members. *Cf. Roes*, 944 F.3d at 1049 n.13.

### 4. The District Court did not appreciate the difference between mandatory and discretionary statutory damages.

During the preliminary approval hearing, the District Court acknowledged the importance of understanding whether some Class Members have claims that are more protective than others. 5-ER-1030-37. The District Court then spent much of the preliminary approval hearing questioning counsel for the Plaintiffs about whether Class Members from certain states could assert claims with mandatory or discretionary damages. *Id.*

In response to the District Court's request for supplemental briefing, 5-ER-1070-71, the Plaintiffs admitted that several states, including Pennsylvania, have privacy-related causes of action, which provide for mandatory statutory damages. 4-ER-619-29. Objectors also devoted considerable attention to the distinction between mandatory and discretionary statutory damages in the Memorandum of Law submitted with their Objections as it bears on both the reasonableness and allocation of the Settlement's benefits. 2-ER-209-39.

Despite such agreement, the District Court overlooked the distinction between mandatory and discretionary statutory damages in granting final approval. 1-ER-2-5. The District Court found that the "Pennsylvania law claims have a much lower statutory damages maximum than the federal maximum for ECPA claims, which was the driving force for [the] nationwide damages model." 1-ER-5. It is true that the "maximum" damages available under the Electronic Communications Privacy Act ("ECPA"), 18 U.S.C. § 2510, exceed the "maximum" that can be obtained under Pennsylvania's Wiretapping and Electronic Surveillance Control Act ("Pennsylvania Wiretap Act"), 18 Pa. C.S. § 5701, *et seq.* But in contrast to the Pennsylvania Wiretap Act, the ECPA grants courts the discretion to award—and not award—statutory damages. 11 U.S.C. § 25020(c)(2).

Given that even the Plaintiffs have admitted that some Class Members can assert claims with "mandatory" statutory damages, 4-ER-619-29, this Court can find that the District Court based its decision on an unreasonable finding of fact. The District Cout's unexplained about-face on this issue also leaves this Court unable to discern whether the District Court would have approved the Settlement had it properly

28

recognized that this case involves some claims with "discretionary"
statutory damages and others with "mandatory" statutory damages.

### 5. The District Court overlooked that all Class Members can assert claims under the IRS Code.

Appellees have acknowledged that the District Court never
addressed Objectors' argument that all Class Members can assert
claims under 26 U.S.C. § 7431 ("IRS Code"). Plaintiffs' Br. at 50-51;
TaxAct Br. at 57. The IRS Code grants taxpayers a private cause of
action with mandatory statutory damages of $1,000 for each act
unauthorized disclosure of tax return information. 26 U.S.C. § 7431(c).

Based on a surface-level reading of *Lane v. Facebook, Inc.*, 696
F.3d 811 (9th Cir. 2012), Plaintiffs contend that the District Court need
not have addressed this claim. Plaintiffs' Br. at 50-51. In *Lane*, the
objectors argued that "some unidentified number of class members may
have a claim under the Video Privacy Protection Act" and that the
settlement undervalues their claims as a result. *Id.* at 822. This Court
found that the "record contradicts Objectors' general argument that the
district court did not meaningfully account for the potential value of the
plaintiffs' claims" as "[b]oth before and after the final settlement
approval hearing, the district court specifically addressed the possibility

29

that the presence of VPPA claims among some class members might affect the class settlement." *Id.* at 823. This Court also held that the district court did not have to "include among its findings specific commentary on each of the plaintiffs' five statutory claims." *Id.* It reasoned that "[a]ll of the plaintiffs' claims arise ***under similar privacy statutes***, and as Facebook correctly points out, the plaintiffs' likelihood of success with regard to each of those claims depends on the same basic legal theories and factual issues." *Id.* (emphasis added).

In contrast to *Lane*, the District Court never addressed Objectors' argument that every Class Member could assert claims under the IRS Code. It did not even acknowledge that Objectors had asserted that all Class Members can assert claims under the IRS Code. *Lane* is also inapposite because the IRS Code is more protective than other statutes—and particularly, the ECPA, which offers discretionary statutory damages and requires only one-party consent—as it required TaxAct to obtain its users' "knowing and voluntary" consent before sharing their confidential tax return information and provides for mandatory statutory damages. 26 U.S.C. § 6103(a); 26 C.F.R. § 301.6103(d)(1).

30

TaxAct claims that Section 6103 of the IRS Code "only 'control[s] the disclosure by the IRS of information received from taxpayers." TaxAct Br. at 57 (quoting *Stokwitz v. United States*, 831 F.2d 893, 894 (9th Cir. 1987)). The fragment of the *Stokwtiz* decision that TaxAct cites leaves out much. Reading the statute in its entirety, this Court recognized that Section 6103 "is clearly designed to protect the information flow between taxpayers and the IRS by controlling the disclosure by the IRS of information received from taxpayers." *Stokwitz*, 831 F.2d at 894. In thus finding that Congress did not intend for there to be a "general prohibition against public disclosure of tax return information," this Court observed that the "statute is concerned solely with the ***flow of tax data to, from, or through the IRS***." *Id.* at 896 (emphasis added). And examining the legislative history further, this Court recognized that Congress intended that Section 6103 guarantee that "[e]ach taxpayer should be confident that the filing of his or her tax returns in no ways compromises the right or privacy." *Id.* at 896 (quoting 122 Cong.Rec. 24013 (1976)).

TaxAct's conduct here fits squarely within Section 6103's proscriptions as it was the very act of preparing and filing their taxes

using TaxAct that compromised the confidentiality of the Class Members' tax return information. 3-ER-312. And with TaxAct having been granted access to tax return information by the Secretary under 26 U.S.C. § 6103(a) and 26 C.F.R. § 301.6103(d)(1), TaxAct can be found liable for disclosing the tax return information it "received in any manner" to any third party without its users' knowing and voluntary consent. The District Court consequently abused its discretion by not considering the availability of this cause of action.

## B.  The record does support the District Court's conclusory statements in the Final Approval Order.

When the District Court's rationale for approving a settlement cannot be determined from its written order, this Court ordinarily remands the matter. *California Pizza Kitchen*, 129 F.4th at 675. While this Court has at times found remand unnecessary "in spite" of the "conclusory" nature of the written order, it has only done so where the district court's reasoning can be discerned from a "voluminous record and extensive hearings." *Compare id.* at 675 & n.4 (finding rationale could be inferred from the "record, which was unusually extensive with multiple hearings and supplemental briefs"); *In re Pac. Enters. Secs. Litig.*, 47 F.3d 373, 377 (9th Cir. 1995) (finding "conclusory

32

statement[s]" supported by record where there was an "extensive settlement hearing" and the court "responded to . . . objections and explained why the derivative settlement [was] fair"); *with Roes*, 944 F.3d at 1050 n.13 (finding the "record does not permit" appellate review); *Allen*, 787 F.3d at 1224 ("the record before us does not allow us to undertake . . . review").

The District Court's rationale cannot be discerned from the record. Unlike *California Pizza Kitchen*, which involved supplemental briefing and multiple hearings with "exhaustive questions and statements" from the district court, 129 F.4th at 675, the hearings here do not permit an inference that the District Court satisfied its procedural obligations.

During the preliminary approval hearing, the District Court opened by noting that it had received a letter from counsel to the Objectors and said: "I'm not sure their objection is well taken . . . ." 5-ER-1029. After counsel for TaxAct clarified that the District Court had not granted the motion to compel arbitration as to Objector Sessoms, the District Court observed that it "strikes [him] on the surface that the overall—like the overall amount of money and the recovery is reasonable and all of that." 5-ER-1029-30. The District Court later

stated that he is "not especially concerned about, you know, the overall amount of recovery or anything like that" but rather with "making sure, you know, it's allocated fairly." 5-ER-1034.

At the final approval hearing, the District Court began:

> So just putting aside the objections for a moment, I'm happy to hear from each of the objectors briefly in a little bit, but just sort of conducting my own, you know, my own preliminary analysis of this is that the settlement is reasonable, but I have some real questions about the attorneys' fees request and the awards for the named plaintiffs."

5-ER-998. The District Court then questioned counsel for Plaintiffs about their request for attorney's fees and class representative service awards, and only that. 5-ER-998-1013. Again, the District Court stated that it is "not as focused on the money part of it." 5-ER-1006.

After counsel for Plaintiffs concluded, the District Court turned to the Objectors and gave "each of the objectors . . . ***three minutes to kind of summarize their objections***." 5-ER-1013 (emphasis added). Only a few minutes later, as counsel to Objectors was speaking, the District Court enforced the time limit set, stating that "[w]e've gone well over the three minutes." 5-ER-1019.

As the transcripts for the preliminary and final approval hearings show, the District Court's questioning here was by no means "exhaustive." *Cf. California Pizza Kitchen*, 129 F.4th at 675. The record is indeed bereft of any discussion of Rule 23(e)'s factors save for attorney's fees and the allocation of the Settlement's benefits. But even for those issues, the concerns the District Court raised went unaddressed in the Final Approval Order. And that leaves this Court without a foundation in the record to deduce the District Court's rationale and find that the District Court satisfied its procedural obligation to ensure that the Settlement is fair, reasonable, and adequate.

## CONCLUSION

For all these reasons, the District Court's decision granting final approval of the Settlement should be reversed.

Respectfully submitted,

COHEN, PLACITELLA & ROTH, P.C.

By:   <u>/s/ Eric S. Pasternack</u>
       James P. Goslee
       Eric S. Pasternack
       2001 Market St., Suite 2900
       Philadelphia, PA 19103
       (215) 567-3500
       jGoslee@cprlaw.com
       epasternack@cprlaw.com

***Counsel to Objectors James Kirkham and Matthew Sessoms***

Dated: July 15, 2025

36

## STATEMENT OF RELATED CASES

Pursuant to Circuit Rule 28.-2.6, Counsel for Objectors are aware

of one related case: *Kirkham v. TaxAct, Inc.*, No. 23-3303 (E.D. Pa.).

s/ Eric S. Pasternack
Eric S. Pasternack

Dated: July 15, 2025

**UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT**

**Form 8. Certificate of Compliance for Briefs**

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)**  25-128

I am the attorney or self-represented party.

**This brief contains**  **6,713**  **words,** including _____ words

manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The

brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[ x ] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or
 Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ x ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
  [ ] it is a joint brief submitted by separately represented parties.
  [ x ] a party or parties are filing a single brief in response to multiple briefs.
  [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).


**Signature**  /s/ Eric S. Pasternack **Date**  7/15/2025
*(use "*s/[typed name]*" to sign electronically-filed documents)*

38

## CERTIFICATE OF SERVICE

I hereby certify that on July 15, 2025, I electronically filed the foregoing Objectors-Appellants' Reply Brief with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the Appellate Electronic filing system. I certify that all participants in the case are registered Appellate Electronic Filing system users and that service will be accomplished by the Appellate Electronic Filing system.

s/ Eric S. Pasternack
Eric S. Pasternack

Dated: July 15, 2025